**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **FRED L. DRAKEFORD,** *et al.*, | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **vs.** | ) | **CIVIL ACTION 1:22-00228-KD-M** |
| | ) | |
| **CONECUH COUNTY COMMISSION,** | ) | |
| **Defendant.** | ) | |

**ORDER**

This matter is before the Court on Defendant Conecuh County Commission's Motion for Summary Judgment (Docs. 23-25), Plaintiffs' Response (Docs. 30, 31), and Defendant's Reply (Doc. 33).

**I.   <u>Findings of Fact</u>**[1]

This case is about the Conecuh County Commission's alleged racial discrimination in failing to pave a particular road in a certain district of Conecuh County with funds from an FY 2020 federal grant. Plaintiffs (Fred L. Drakeford, Maurice Lee, and The Conecuh County Chapter of the NAACP) claim that Conecuh County's lack of action was in violation of Title VI and the Equal Protection Clause of the Fourteenth Amendment.

Conecuh County is the 18th largest county in the state (850.16 square miles), mostly rural, with a higher-than average poverty rate (4th poorest county in Alabama by per-capita income), and has 809 miles of paved and gravel roads, 400 miles of dirt roads, and 161 bridges. (Doc. 23-10 at 2 (Decltn. Foshee); Doc. 23-1 at 2-3, 6 (Decltn. Campbell)); Doc. 23-4 (Ex. D (FY2020 Grant Application));

---

[1] The facts are taken in the light most favorable to the non-movant. <u>Tipton v. Bergrohr GMBH–Siegen</u>, 965 F.2d 994, 998-999 (11th Cir. 1992). The "facts, as accepted at the summary judgment stage of the proceedings, may not be the actual facts of the case." <u>Priester v. City of Riviera Beach</u>, 208 F.3d 919, 925 n. 3 (11th Cir. 2000).

Doc. 25 at 3). Many roads are unpaved, including Spring Hill Road (a/k/a Pleasant Hill Road), the road on which African American Plaintiffs Drakeford and Lee reside.  (Doc. 1 at 2).

The governing body in Conecuh County is the Conecuh County Commission (the Commission). The Commission is comprised of five (5) Commissioners who represent each of the five (5) separate geographical districts in the County. (Doc. 23-1 at 2-3, 6 (Decltn. Campbell); Doc. 23-10 at 1 (Decltn. Foshee); Ala. Code §§ 45-18-70.02, 45-18-70.03). Every fiscal year, per Alabama law, the Commission is required to maintain a balanced budget, set a budget for the County, and is responsible for funding a range of public services such as road paving and maintenance. (Doc. 23-1 at 2-3, 6 (Decltn. Campbell)). Each Commissioner is responsible for inspecting roads and bridges as well as the day-to-day maintenance of the dirt roads in their Districts. (Doc. 23-1 at 2-3, 6 (Decltn. Campbell); Doc. 23-10 at 1 (Decltn. Foshee); Ala. Code §§ 45-18-70.02, 45-18-70.06). The County Engineering and Road Department is responsible for maintaining the paved and gravel public roads and bridges, and the County Engineer is responsible for work that requires a professional license by law. (Doc. 23-10 at 1 (Decltn. Foshee); Doc. 23-1 at 3, 6 (Decltn. Campbell)).

Over the past 22+ years, the County and County Engineer Winston Foshee (Foshee) have been researching, studying, and addressing the deficiencies of the County's street and road network.  (Doc. 23-4 at 8 (FY2020 Grant Application)). According to Foshee, maintaining the County's paved and gravel roads and bridges at an acceptable level costs over $1 million each year. (Doc. 23-10 at 2-3 (Decltn. Foshee)). Funding for County road maintenance and paving has been provided by a combination of tax revenues, funds received through the Alabama Transportation Rehabilitation and Improvement Program (ATRIP), federal funds, and oil/gas production. (Id.) Since 1998 (or at least 2000), funding for the County has been provided primarily via federal grant funds, including Community Development Block Grants (CDBG) through the Alabama Department of Economic and

Community Affairs (ADECA). (Doc. 23-10 at 3 (Decltn. Foshee); Doc. 23-1 at 3, 6 (Decltn. Campbell)). The Commission has applied for such grants to pave roads and/or extend water lines. (Doc. 23-1 at 3, 6 (Decltn. Campbell)). These grants are competitive, can only be used for certain purposes, and the majority of beneficiaries have to be low or moderate income. (Id.) Additionally, CDBG grant applications require specificity – stating exactly what the County plans to do with the federal funds and requiring that the County provide information about the grant beneficiaries to ensure compliance with income requirements. (Id.) The Commission regularly applies for these grants and has been awarded five (5), including a grant in FY2020 to pave roads. (Doc. 23-4 (FY2020 Grant Application); Doc. 23-1 at 3-4, 6 (Decltn. Campbell)).

Each year Conecuh County Engineer Foshee "establish[es] a proposed list of priorities… of roads and bridges that need resurfacing and major maintenance throughout the County, based on condition, which the Commission is then responsible for approving." (Doc. 23-10 at 2-3 (Decltn. Foshee)). In 2020, Foshee submitted such a list for District One. (Doc. 23-3 (Foshee List)). The listed set forth the following priority roads:

| ROADWAY | LENGTH (MILES) | HOMES | CHURCHS | BUSINESS | HOMES PER MILE |
|---|---|---|---|---|---|
| TED COURT | 0.189 | 8 | | | 42.24 |
| MT ZION RD TO ZION LN TO LOIS LN * | 0.530 | 14 | | | 26.40 |
| PLEASANT HILL RD | 0.606 | 15 | | | 24.75 |
| PEE WEE LN | 0.204 | 4 | | | 19.59 |
| CLINTON RD | 0.256 | 4 | | | 15.62 |
| FLAT ROCK (WEST END) | 0.597 | 9 | | | 15.09 |
| SPENCE MCGRAW RD FIRST 1500 FT OFF HOLY BRANCH | 0.284 | 4 | | | 14.08 |
| TEMPLE RD | 0.146 | 2 | | | 13.71 |
| ALONZO LN | 0.076 | 1 | | | 13.20 |
| DUSTY LN, TRACY COVIN | 0.552 | 7 | | 1 | 12.69 |
| SANTEE RD | 0.758 | 9 | | 1 | 11.88 |
| EASY RD | 0.347 | 4 | | | 11.52 |
| BUSH LN | 0.455 | 5 | | | 11.00 |

(Id.) Foshee's list included Pleasant Hill Road (a/k/a Spring Hill Road)). (Id.) According to Foshee, the decision about whether to pave a certain road "necessarily involves policy and political decisions

3

like whether a project will result in potential economic growth that would benefit the County as a whole and weighting all the potential liabilities. Making such decisions are not my job; therefore, I do not make recommendations to the Commission about which roads should be paved."  (Doc. 23-10 at 3-4 (Delctn. Foshee)).

On June 9, 2020 a public hearing was held regarding the County grant paving project. (Doc. 23-7 at 4-7, 13-15). On June 23, 2020 the Commission, via Chairman Leonard Millender (Millender), applied for a $350,000 State of Alabama Small Cities CDBG grant "to construct road improvements" in the County (to pave roads) (the FY2020 Grant). (Doc. 23-4 at 3 (Grant Application); Doc. 23-1 at 3, 6 (Decltn. Campbell)). According to the application, the project would pave 26 streets, benefit 137 households occupied by 329 individuals (@ 91.19% (300) low and moderate income), include the installation of storm draining facilities and extensive roadbed preparing, as well as street paving to eliminate existing safety threats to the residents of the affected roads.  (Doc. 23-4 at 4-5, 10, 12-13 (Grant Application)). The Commission identified the beneficiaries as 85 White individuals, 35 White households, 244 Black/African American individuals, and 102 Black/African American households. (Doc. 23-4 at 21, 36).  The Application specified the following roads to be included in the project:

```
The project is located at 29 Sepulga Tower Road to 278 Sepulga Tower
Road, 87 Robert Lark Lane to 420 Robert Lark Lane, 97 George Lee Road
to 706 George Lee Road, 476 County Road 92, 10 Ted Court to 225 Ted
Court, 1374 County Road 32, 25 Nymph Lane to 540 Nymph Lane, 114
Chasen Road to 190 Chasen Road, 152 Dees Lane to 152-A Dees Lane, 106
Franklin Lane to 203 Franklin Lane, 154 Peters Hill Road to 195 Peters
Hill Road, 52 Blue Bird lane to 60 Blue Bird Lane, 7645 Highway 31 to
7661 Highway 31, 75 Stormy Drive to 212 Stormy Drive, 55 Magnolia Loop
to 57 Magnolia Loop Road, 105 Gillie Roache Lane to 384 Gillie Roache
Lane, 30 Cedar Lane to 61 Cedar Lane, 155 Bird Lane to 230 Bird Lane,
12 Sawgrass Circle to 136 Sawgrass Circle, 8 Under the Hill Lane to 51
Under the Hill Lane, 11 J. P. Howard Road to 325 J. P. Howard Road, 30
Short Lane to 120 Short Lane, 63 Zion Lane to 209 Zion Lane, 34 Tracy
Covin Road to 93 Tracy Covin Road, 244 Dusty Road to 426 Dusty Road,
and 1011 Spence McGraw Road to 1550 Spence McGraw Road, Evergreen, AL
36401; 1204 Merritt Road to 1448 Merritt Road, Castleberry, AL 36432;
and 55 Peppermint Drive to 160 Peppermint Drive, 111 Lewis Road to 265
Lewis Road, 16 Colt Lane to 150 Colt Lane, 169 Wheat Grass Road to 256
Wheat Grass Road, 5 Rudolph Road to 180 Rudolph Road, 12 Widow Lane to
60 Widow Lane, and 252 Ryals Road to 692 Ryals Road, Repton, AL 36475.
```

(Doc. 23-4 at 18 (Grant Application)). The Application did not include Spring Hill Road (a/k/a Pleasant Hill Road). (Doc. 23-4).

District One is one of the five (5) districts in Conecuh County.  (Doc. 23-1 at 2-3, 6 (Delctn. Campbell)). The Commissioner of District One is Commissioner Campbell (Campbell). (Id. at 2 (Decltn. Campbell)). There are about 121 miles of unpaved dirt roads in District One.  (Id. at 3, 4, 6 (Decltn. Campbell).  "People of all races live on those roads."  (Id. at 4 (Decltn. Campbell)).  Per Commissioner Campbell, "[p]retty much everyone who lives on a dirt road wants their road paved, but we just can't afford it. In addition to the initial cost, it costs a lot more money to safely maintain a paved road than a dirt road. A poorly maintained paved road can be a significant liability risk, much more so than a dirt road."  (Id.) Over the years, Commissioner Campbell has received "pretty ugly" and "mad" messages from citizens requesting that their roads be paved if/when they see other County roads being paved.  (Id. (Decltn. Campbell); Doc. 23-2 (Dep. Campbell)).

Spring Hill Road is a road located in District One. Some of Spring Hill Road is paved and some of the road remains unpaved; a portion was paved with a grant in 2001.  (Doc. 23-8).  Plaintiffs Drakeford and Lee live on the unpaved portion of Spring Hill Road. (Doc. 23-5 (Dep. Drakeford)); Doc. 23-6 (Dep. Lee)). The majority of the homes on the paved portion of this road are owned by Black residents (only one (1) White person has a camp house off the road).  (Doc. 23-5 at 2-3 (Dep. Drakeford at 10-11)). According to Drakeford, about 10 or 12 houses are located on the section of this road that remains unpaved, whereas according to Lee there are about 20 such houses.  (Id. at 8 (Dep. Drakeford at 16); Doc. 23-6 (Dep. Lee at 11)).

Commissioner Campbell has not seen any conditions that would make Spring Hill Road particularly in need of paving – when compared to the other 121 miles of unpaved dirt road in District One. (Doc. 23-2 at 2-4 (Dep. Campbell at 78-80)). However, Commissioner Campbell testified that

when he first took office in 2016, Spring Hill Road was "the first thing that came up." (Id. at 9 (Dep. Campbell at 29)). Concerning complaints about Spring Hill Road, a non-party named Mr. Boykin complained to him at commission meetings about the road's paving being finished (it was already partly paved). (Id. at 2 (Dep. Campbell at 12)). Yet Commissioner Campbell testified: "I hadn't had a whole lot of complaints on that road …. he's been the one to bring everything up." (Id. at 3 (Dep. Campbell at 13)). "The onliest person that has really come after me about that road is Mr. Boykin and he don't live down there." (Id. at 9 (Dep. Campbell at 29)). On one occasion, Mr. Boykin attended a commission meeting and presented a petition signed by citizens regarding the road. (Doc. 31-1 at 11, 15 (Dep. Campbell at 12, 16)). As for any promises to Boykin, however, I don't actually remember making a promise but I told him [Boykin] at one time that I would look into it." (Doc. 23-2 at 6 (Dep. Campbell at 22)). "I would consider it." (Id.) On May 22, 2017, Boykin attended a commission meeting and asked Commissioner Campbell to make the request for paving the 7/10-mile portion of Spring Hill Road that remains unpaved, and he testified that even though he is only one vote, he could make the decision – but it would mean he would "put my recommendations down and we [the entire Commission would then] vote on it." (Doc. 31-1 at 41 (Dep. Campbell at 42)). Otherwise, non-party individual Nathan Robinson sent Commission Campbell "some pretty ugly text messages" complaining about the Road. (Id. at 4-5 (Dep. Campbell at 14-15)).

    In 2020, the foregoing Foshee priority list for District One was submitted to Commissioner Campbell, who reviewed same and considered such factors as "what roads are traveled the most" and what roads would "help grow and support community business." (Doc. 23-1 at 3, 6 (Decltn. Campbell)). Commissioner Campbell chose the following roads to be paved: part of Spence McGraw Road due to the presence of a popular in-home daycare, Dusty Lane/Tracy Covin Road because it had another business, Ted Court and Mt. Zion Roads because they had the most homes per mile, and Santee

Road which had a business on it.  (Id. at 3-4, 6 (Decltn. Campbell)).  Commissioner Campbell did not choose Pleasant Hill Road (a/k/a Spring Hill Road)).

In 2021, the Commission was awarded the grant and received a $350,000 to pave roads in Conecuh County.  Surveys conducted indicate that the direct beneficiaries of the Grant "were overwhelmingly Black/African American throughout the County as a whole[;] approximately 92.2% of the beneficiaries met the low/moderate income threshold[;]" and "the direct beneficiaries in District One were also mostly Black/African-American, with a total of 31 direct Black/African-American beneficiaries and 17 white beneficiaries." (Doc. 23-4).

The Commission split the funds by District to be fair and to ensure a high cost-benefit ratio of $960.49 per direct beneficiaries.  (Doc. 23-1; Doc. 23-4).  In connection with the Grant, "[s]ince there are so many unpaved roads" in the County, "we decided that the fairest way would be to split up the grant funds equally between the districts. Each Commissioner received a list of roads that would be eligible for the grant."  (Doc. 23-1 at 3, 6 (Decltn. Campbell)). "[W]e decided on a total amount that we would spend and divided it up between the districts."  (Id. at 4, 6 (Decltn. Campbell)). "[T]he Commission has to look at the big picture when decided how to spend it [the money]. No amount of calls or petitions [from residents] can change our bottom line."  (Id. at 5-6 (Decltn. Campbell)).

On March 22, 2022 a close-out public hearing was held to discuss the accomplishments of the grant paving project. (Doc. 23-7 at 3 (Public Notice – Close Out); Doc. 23-7 at 8).

On June 14, 2022, Plaintiffs Fred L. Drakeford (Drakeford), Maurice Lee (Lee), and the Conecuh County Branch NAACP (NAACP) initiated this action against Defendant Conecuh County Commission (Commission) alleging discrimination on the basis of race with regard to road paving services in Conecuh County, AL, in violation of: 1) Title VI of the *Civil Rights Act of 1964* (Count I);

and 2) the Equal Protection Clause of the Fourteenth Amendment made actionable by 42 U.S.C. § 1983

(Count II).  (Doc. 1). Specifically, Plaintiffs allege in the Complaint as follows:

> In early 2021, Defendant received a $350,000 Community Block grant for the paving of Spring Hill Road.
>
> This grant was sought by using the demographics of the Spring Hill Road area to show the great need for the road paving financial assistance.
>
> Spring Hill Road is a roadway divided by race, with the paved portion of the road running parallel to the relatively small number of homes owned by White residents living on Springhill Road. However, the greater number of homes on Springhill Road are occupied by Black residents, and the dividing line between the white occupied homes and the minority occupied homes is the same line that divides the paved portion of the road from the unpaved section.
>
> On the portion of Springhill Road occupied by Black residence [sic], this approximately one mile-stretch of roadway is entirely unpaved. And for over 15 years that portion of Spring Hill Road providing access exclusively to Black residents has been the object of annual promises by Defendant during County Commission meetings and the grant application process, to pave that section of road. But such promises and representations to funding sources go unfulfilled at end of each succeeding fiscal year.
>
> In contrast, roads in predominantly White areas of Evergreen are regularly paved through projects approved by Defendant and funded by grants comprised in whole or part by federal monies.
>
> In 2020, Defendant applied for the grant having made specific promises to constituents that that portion of Spring Hill Road serving Black households would finally be paved.
>
> Once the grant funding was received … Defendant completed projects in October and November 2021 that again left Black residents' portion of Spring Hill Road unpaved as Defendant used funds specifically earmarked for paving Spring Hill Road to instead maintain roads in areas of Evergreen populated exclusively by Whites.
>
> … Plaintiffs aver that Defendant Conecuh County Commission has discriminated against them and other Black residents of Conecuh County, Alabama, on the basis of race in the allocation of programs and activities receiving federal funding in violation of Title VI of the Civil Rights Act of 1964, and the Equal Protection Clause of the 14th Amendment to the US. Constitution.

(Doc. 1 at 3-5). As relief, Plaintiffs seek (in part) entry of a declaratory judgment "that the Defendant has engaged in unlawful discrimination[]" and violated the Fourteenth Amendment, and "[i]njunctive

relief requiring that public paving funds be expended in a fair an[d] equitable fashion, with the immediate paving of roads and streets in minority communities as repeatedly promised in public meetings and grant applications.  (Id. at 5).

## II.    Conclusions of Law - Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a). Rule 56(c) provides as follows:

*(c) Procedures*

*(1) Supporting Factual Positions.* A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

**(A)** citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

**(B)** showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

*(2) Objection That a Fact Is Not Supported by Admissible Evidence.* A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.

*(3) Materials Not Cited.* The court need consider only the cited materials, but it may consider other materials in the record.

*(4) Affidavits or Declarations.* An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

FED.R.CIV.P. Rule 56(c).

The movant must demonstrate "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court views the evidence

and the inferences from that evidence in the light most favorable to the nonmovant. Jean–Baptiste v. Gutierrez, 627 F.3d 816, 820 (11th Cir. 2010).  The movant "always bears the initial responsibility of informing the district court of the basis for its motion." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). This responsibility includes identifying the portions of the record illustrating the absence of a genuine dispute of material fact. Id. Alternatively, a movant who does not have a trial burden of production can assert, without citing the record, that the nonmoving party "cannot produce admissible evidence to support" a material fact. Fed. R. Civ. P. 56(c)(1)(B); see also Fed. R. Civ. P. 56 Adv. Cmte. Note ("Subdivision (c)(1)(B) recognizes that a party need not always point to specific record materials.... [A] party who does not have the trial burden of production may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to the fact."). If the movant meets its burden, the burden shifts to the nonmoving party to establish -- with evidence beyond the pleadings—that a genuine dispute material to each of its claims for relief exists. Celotex, 477 U.S. at 324. A genuine dispute exists when the nonmoving party produces evidence allowing a reasonable fact finder to return a verdict in its favor. Waddell v. Valley Forge Dental Assoc., 276 F.3d 1275, 1279 (11th Cir. 2001).

## III.    Conclusions of Law - Discussion

Initially, to the extent Plaintiffs attempt to assert new claims, Plaintiffs are limited to the claims and allegations of their Complaint. See, e.g., Flintlock Const. Servs., LLC v. Well-Come Hldgs., LLC, 710 F.3d 1221, 1227-1228 (11th Cir. 2013) ("[t]his court's precedent foreclosed Well–Come's attempt to amend its complaint at the summary judgment stage without seeking leave of court pursuant to Rule 15(a)(2)[]"); GeorgiaCarry.Org, Inc. v. Georgia, 687 F.3d 1244, 1258 and note 27 (11th Cir. 2012) ("[i]t is well-settled in this circuit that a plaintiff may not amend the complaint through argument at the summary judgment phase[]"); Gilmour v. Gates, McDonald & Co., 382 F.3d 1312, 1315 (11th Cir.

2004) ("[a] plaintiff may not amend h[is] complaint through argument in a brief opposing summary judgment[]"); King v. ST Aerospace Mobile, Inc., 2013 WL 2635926, *8 (S.D. Ala. Jun. 11, 2013) (plaintiff cannot amend to add new causes of action via summary judgment).  The result is that the allegations/claims raised for the first time by Plaintiffs on summary judgment, but not alleged in the Complaint, need not be considered. Nevertheless, to the extent Plaintiffs believe that their summary judgment opposition claims/allegations merely expand upon that already contained in their Complaint, the Court finds as follows.

Plaintiffs' claims in their complaint are based on disparate treatment – that the County (via Commissioner Campbell) provided disparate public services (road paving) to them because of their race (African American), and did so intentionally.  However, the paucity of evidence Plaintiffs submit is fatal to their claims.

Section 601 of Title VI provides that "[n]o person in the United States shall, on the ground of race … be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." *Civil Rights Act of 1964*, Section 601, 42 U.S.C. § 2000d. "By its terms, Title VI prohibits *intentional* racial discrimination in programs receiving federal funding." Davis-Dudley v. Jefferson Cty. Bd. of Ed., 2010 WL 11615018, *4 (N.D. Ala. Sept. 17, 2010) (emphasis in original), *Report & Recommendation adopted by* 2011 WL 13287089 (N.D. Ala. May 18, 2011).[2] "Title VI … applies in all programs receiving federal funds … conditioning an offer of federal funding on a promise by the recipient not to discriminate...." Rollins v. Board of Trustees of the Univ. of Ala., 2014 WL 4829540, *17 (N.D. Ala. Sept. 29, 2014). The Fourteenth Amendment Equal Protection Clause provides that "[n]o State shall ... deny to any person within its

_____

2 Title VI also "proscribe[s] actions having a disparate impact on groups protected by the statute, even if those actions are not intentionally discriminatory." Elston v. Talladega Cty. Bd. of Ed., 997 F.2d 1394, 1406 (11th Cir.1993). Here, however, Plaintiffs allege only intentional discrimination.

jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. As summarized in Elston

v. Talladega Co. Bd. of Ed., 997 F.2d 1394, 1406 (11th Cir. 1993):

> … To establish an equal protection clause violation, a plaintiff must demonstrate that
> a challenged action was motivated by an intent to discriminate. *See, e.g., Village of
> Arlington Heights v. Metropolitan Hous. Dev. Corp.,* 429 U.S. 252, 265 … (1977);
> *Washington v. Davis,* 429 U.S. 229, 239–48 … (1976). Discriminatory intent may be
> established by evidence of such factors as substantial disparate impact, a history of
> discriminatory official actions, procedural and substantive departures from the norms
> generally followed by the decision-maker, and discriminatory statements in the
> legislative or administrative history of the decision. *Arlington Heights,* 429 U.S. at
> 265–69…. Discriminatory intent may be found "even where the record contains no
> direct evidence of bad faith, ill will or any evil motive on the part of public officials."
> *Williams v. City of Dothan, Ala.,* 745 F.2d 1406, 1414 (11th Cir.1984).

As specified in Burton v. City of Belle Glade, 178 F.3d 1175, 1188-1189 (11th Cir. 1999) (footnote

omitted), to prove an Equal Protection claim, a plaintiff must show that the County's "decision or act

had a discriminatory purpose and effect[]":

> Section 1983 provides a cause of action for constitutional violations committed under
> color of state law.[] To prevail, plaintiffs must demonstrate both that the defendants
> deprived them of a right secured under the Constitution or federal law and that the
> deprivation occurred under color of state law …
>
>             ***
>
> … Appellants must show … the …. decision or act had a discriminatory purpose and
> effect … [which] … may be established by proof that the City used race as a substantial
> or motivating factor in its …. decisions and practices. … If the …. decisions created
> an express racial classification, no inquiry into discriminatory purpose is necessary.
> However, once a discriminatory purpose is established, the burden shifts to Appellees
> to prove that, at the time of the discriminatory act, the same decision would have been
> made for a legitimate reason …
>
> We evaluate all available direct and circumstantial evidence of intent in determining
> whether a discriminatory purpose was a motivating factor in a particular decision …
> all "actions having foreseeable and anticipated disparate impact are relevant evidence
> to prove the ultimate fact, forbidden purpose." …

In summary, Title VI claim requires the same analysis as Title VI and the Fourteenth

Amendment's Equal Protection Clause are coextensive – "discrimination that violates the Equal

Protection Clause … committed by an institution that accepts federal funds also constitutes a violation

of Title VI." Holton v. City of Thomasville Sch. Dist., 425 F.3d 1325, 1329 n. 1 (11th Cir.2005) (same - quoting Gratz v. Bollinger, 539 U.S. 244, 276 n. 23 (2003)). "The analysis of a Title VI intentional discrimination claim mirrors a Fourteenth Amendment Equal Protection claim." Hamil v. Vertrees, 2001 WL 135716, *12 (M.D. Ala. Jan. 10, 2001) (citing Elston, 997 F.2d at 1406 at n. 11 ("[s]ince Title VI itself provides no more protection than the equal protection clause -- both … bar only intentional discrimination … we will not engage in a separate discussion of … Title VI … as such an inquiry would duplicate exactly our equal protection analysis[]"). "Title VI itself provides no more protection than the equal protection clause – both provisions bar only intentional discrimination." Elston v. Talladega Co. Bd. of Ed., 997 F.2d 1394, 1405 n. 11 (11th Cir. 1993).

First, much of Plaintiffs' asserted "undisputed facts" lack any evidentiary citation and so are unsupported and unreviewable on summary judgment. Even if the Court were to consider the claims/allegations raised for the first time by Plaintiffs in opposition to summary judgment, the *only* evidence Plaintiffs submit is the deposition testimony of non-parties Chairman Millender and Commissioner Campbell -- testimony which does little to address the claims alleged in the Complaint and/or establish the existence of genuine issues of material fact. Further complicating matters, Plaintiffs submit *the entirety* of these Commissioners' depositions (approximately 100 pages) yet only cite 27 pages (Pages 6, 12-13, 16-18, 21-23, 27, 31-32, 41-43 of Campbell's deposition (15 pages) and Pages 12-14, 20, 23, 27, 32, 40, 44-46, and 53 of Millender's deposition (12 pages)). Any review of these depositions then, is necessarily limited to the portions of these evidentiary materials to which either party has made *specific citation*.

Second, Plaintiffs offer little evidence to support their claims. Plaintiffs do not even submit the deposition testimony of Plaintiffs Drakeford and/or Lee, and the evidence submitted by the Defendant reveals that Plaintiffs' arguments consist of speculation, assumption, and conjecture. Specifically,

13

Defendant's submission of the depositions of Drakeford and Lee reveals that Plaintiffs' belief that the Commission racially discriminated against them by failing to pave Spring Hill Road is based on what they heard around town, because they "felt like" the Commission should know they wanted the road paved, the assumption that it "should've been on the list to get paved[,]" and that even though they lacked any knowledge about the grant application they just believed Spring Hill Road should have been selected for paving. (Doc. 23-5 (Dep. Drakeford); Doc. 23-6 (Dep. Lee)).

For example, when Drakeford was asked what led him to believe Spring Hill Road was not paved because of race discrimination and that the grant funds were being used to pave areas exclusively populated by whites, he testified that he saw Bull Slough Road being paved, other roads in different districts being paved, "I just like sensed it[,]" and that his belief was based on his personal observations -- "it seems like there's more paving in the other district." (Doc. 23-5 at 12-14, 18-19, 25 (Dep. Drakeford at 20-23, 29-30, 38)). As for Plaintiffs' allegation that the Commission used Spring Hill Road demographics to obtain the grant, Drakeford testified that he was at a Commission meeting after August 2020 "when they said they was going to apply for a grant to get our road paved[;]" however, this testimony states nothing about the the road's demographics for/in the grant application.  (Doc. 23-5 at 10-11 (Dep. Drakeford at 18-19)). Moreover, Drakeford testified that some three (3) years before his deposition in this case, "[w]e was going to the meeting, we was always … promised, and even Mr. Campbell told us that, when we get the grant in, y'alls road is going to be a main priority."  (Doc. 23-5 at 19 (Dep. Drakeford at 30)).[3]   However, this testimony (allegedly breaking a promise) fails to support intentional discrimination. And when asked about the roads that were paved in District One

---

3 Apart from that, Drakeford testifies about what he did and said before Commissioner Campbell was elected to office in 2016: in 2011, "[w]e was showing up at the county commission office so regular, one of the white commission told our commission that these black people been coming up. Here complaining about their road that it's not fair for you to jump ahead of them and pave the white community road."  (Id. at 19-20 (Dep. Drakeford at 30-31)). Drakeford also similarly testified that he has "been going to the board since '09[]" to complain about Spring Hill Road.  (Doc. 23-5 at 13 (Dep. Drakeford at 21)).

with the grant funds (Dusty Lane/Tracy Covin, Ted Court, Mt. Zion, etc.), Drakeford testified that he was "not even familiar" with or had "never heard of" certain roads, did not know about their racial makeup, and testified as to one that "it's black" – adding though that "some of these roads was paved with no people – with one or two houses on it[]" "[a]nd they were whites."  (Id. at 21-23 (Dep. Drakeford at 34-36)). Drakeford testified that "[i]n our district, we don't see anything there [getting paved] in the black community."  (Id. at 24 (Dep. Drakeford at 37)). Per Drakeford, the paving is racially discriminatory and Spring Hill Road has not been paved due to race because: "I can see the white commission," other districts pave a lot more roads than in District One, and "[b]asically anytime we get anything did down there, I really had to call to the county commission office and beg him to come down and grade the road, remove the trees …I don't never see them really just volunteering to come down there and do anything[]" "[b]ut then I can see some of the dirt road that the whites live on [about 500 feet adjacent to Spring Hill Road] …. they come up there and … grade it … and they keep that road in good shape." (Doc. 23-5 at 25-27 (Dep. Drakeford at 38-40)). Per Drakeford, he just goes by what he's called the commission about and what he sees, to form his belief.  (Id. at 28 (Dep. Drakeford at 41)). Yet Drakeford testified that he did not know which roads were paved with the grant funds, that he had never seen the grant application (identifying the roads) until his deposition, and that he based his belief about race discrimination in paving on the fact that Bull Slough Road was paved and other roads in other districts were paved.  (Id. at 12-13, 21 (Dep. Drakeford at 20-21, 34)).

Similarly, Lee testified that he thought Spring Hill Road was included in the grant and was sought using Spring Hill Road demographics because "we had been asking to get our road paved[;]" decided the reason this road remained unpaved was due to race discrimination because he began "seeing other roads had been paved" "in the white folks area [JP Howard Road, Bull Slough Road];" and when Commissioner Campbell (and the prior commissioner Hugh Barrow) was "running" "they

was saying that they was going to pave it." (Doc. 23-6 at 2, 5-7, 11-12, 15 (Dep. Lee at 9, 13-15, 19-20, 23)). "[T]hat's basically what I know." (Id. at 6 (Dep. Lee at 13)). Lee testified that he "assumed" the grant funds had been earmarked to pave Spring Hill Road: "I mean, if they gave grants, I felt like they should know … we asked to pave the roads, so I felt like we should've been – the neighbors … already saying that they was going to pave it. So I felt like that we should've been on the list to get paved." (Doc. 23-6 at 15-16 (Dep. Lee at 23-24)).  As to the racial makeup of the roads in District One that were paved with federal funds, Lee testified that he did not know or was not familiar with the roads for all but two, which were "[p]redominantly black." (Id. at 4 (Dep. Lee at 11)). Other than the paving of JP Howard Road and Bull Slough Road, Lee thought Spring Hill Road was not being paved because of racism because "they was saying that they was going to pave it, we never did see them pave it, and so we had to move forward [file suit][]" -- "just been seeing ... other roads had been paved . . in the white folks area[]" but our road "ain't been maintained good[]" since Commissioner Campbell has been in office.  (Doc. 23-6 at 11, 14-15, 20 (Dep. Lee at 19, 22-23, 28)). Lee testified that he heard Commissioner Campbell say he would pave Spring Hill Road, but provided no details.  (Id. at 13-14 (Dep. Lee at 21-22)).

Neither Drakeford nor Lee's deposition testimony supports a finding of intentional discrimination by the Commission – that the road paving decisions related to the FY 2020 grant were racially discriminatory (to intentionally improve/pave White roads instead of African American roads in District One). Plaintiffs' testimony does not establish discriminatory intent. Additionally, the roads highlighted by Plaintiffs for comparison to endeavor to show racial discrimination, JP Howard Road and Bull Slough Road, are irrelevant.[4] Moreover, Plaintiffs have not disputed (or even addressed) the

_____

4 JP Howard Road is located in District Four, not District One. (Doc. 23-6; Doc. 23-3). Bull Slough Road was paved in 2019 and not with the 2020 grant funds, but instead as part of the only County-funded

evidence indicating that the beneficiaries of the grant funds were overwhelming African American: 244 African American individuals and 102 African American households in contrast with 85 White individuals and 35 White households,. (Doc. 23-4 at 21, 36).

Moreover, even if this Court were to consider the arguments as to Commissioner Campbell and/or Chairman Millender, Plaintiffs have failed support their allegations with evidence as well as failed to dispute the reasons Commissioner Campbell has stated for selecting the roads to pave that were paved. Specifically, Plaintiffs argue that genuine issues of material fact exist due to: 1) Chairman Millender's admission that paving decisions are tainted by racial bias; 2) "allegations of racism against Commissioner Campbell that even Campbell himself acknowledges" (Doc. 30 at 25 (citing Dep. Campbell at 23)); and 3) Campbell's admission that he uses race as factor in selecting the roads in his district to receive paving funds. (Doc. 30 at 25).

The Court first addresses Plaintiffs' contention regarding "allegations of racism against Commissioner Campbell that even Campbell himself acknowledges" (Doc. 30 at 25 (citing Dep. Campbell at 23)) and Campbell's "admission that he uses race as factor in selecting the roads in his district to receive paving funds." A conclusory claim that allegations of racism against Campbell exist, standing alone, does not support Plaintiffs' claims in this case; and Plaintiffs have not submitted any evidence of racial discrimination by Commissioner Campbell or that race played a factor in his selection of roads. At best, on Page 23 of Campbell's deposition he states: "I'm not a prejudiced person. I know a lot of them are saying that." Lacking any additional information on summary judgment, this testimony and Plaintiffs citation to same, supports nothing. Additionally, as to Campbell's "admission" that he uses race as a factor when selecting roads to pave, Campbell testified, as to paving decisions,

---

paving project in this century and due to traffic (people using the road to travel to Andalusia and from visitors to the historic bridge and kayaking trail) with some funds being used to build a concrete canoe launch ramp to aid economic development.  (Doc. 23-1 at 4, 6 (Decltn. Campbell); Doc. 31-3 at 32 (Dep. Campbell at 33)).

that while he "could[]" "[p]robably" have done something over the seven (7) years he has been a Commissioner to satisfy the residents on Spring Hill Road, "[i]t's nothing to be prejudiced[]" – rather, "[i]t's easier to work with people that don't hound you all of the time[]" and while he is "not punishing anybody[]" he does not pave the street of those who "hound" him. Moreover, Campbell's Declaration clarifies that he acknowledges he should not have testified that he was sometimes more favorably inclined towards people who are less annoying, but that he gets frustrated with people who "keep coming after" him about a road not being paved because he already knows it is a problem.  (Doc. 23-1). There is nothing in the evidence indicating that race – versus annoyance -- played any role in Commissioner Campbell's decisions.  Further, Commissioner Campbell asserts that "[r]ace has never been a factor in deciding which roads are paved decisions … there are over 100 miles of dirt roads in my district, and people of all races live on those roads." (Doc. 23-1 at 4 (Decltn. Campbell)). According to Campbell: "I assume that everyone who lives on a dirt road would like their road to be paved – and I would like to have the money to pave and maintain all 400 or so miles of dirt roads in the County. But we can't. There is only so much money, and the Commission has to look at the big picture when deciding how to spend it. No amount of calls or petitions can change our bottom line." (Id. at 4-5).

None of the foregoing suggests that Commissioner Campbell's paving decisions are racially discriminatory. At most, Campbell testified: "I tried to pick some roads that was in the minority section and that other section."  (Doc. 23-2 (Dep. Campbell at 18)). This testimony does not indicate racial *discrimination*. Rather, it suggests that Campbell was trying to ensure that some roads in the minority section were paved each time.  Finally, Commissioner Campbell testified that if he decided to use his District's funds for Spring Hill Road "we would all vote on it …. But it would be my decision where to use the funds."  (Doc. 31-3 at 20 (Dep. Campbell at 21)). Commissioner Campbell's decision to

18

pave the roads that he did with the funds – and not Spring Hill Road – based on the reasons he has asserted is not evidence of intentional discrimination.

As for Plaintiffs' contention that genuine issues of material fact exist due to Chairman Millender's "admission that paving decisions are tainted by racial bias[,]" the Court is not persuaded. Chairman Millender testified that he agreed with the sentiment that some roads appear to be paved in a biased fashion and that there was a history of discrimination in paving dating back 35 years ago when he first took office. (Doc. 31-2 at 27 (Dep. Millender at 27)). However, Commissioner Millender did not testify that Commissioner Campbell's paving decision was racially biased or "appeared to be paved in a biased fashion" or that Commissioner Campbell acted discriminatorily (intentionally or otherwise) in his paving decisions for District One in relation to the 2020 grant funds. Chairman Millender also clarified his testimony regarding discrimination, explaining "[i]t wasn't [Commissioner] Campbell[]" but a former Commissioner for District Three. (Id. at 53 (Dep. Millender)). Thus, there is no indication that Millender's testimony is even relevant to Plaintiffs' claims about Commissioner Campbell's paving decisions with the grant funds.

Having addressed the foregoing, the Court turns to Plaintiffs' argument that Commission Campbell made a promise to them "to pave Spring Hill Road for its Black residents" with the federal grant funds, based on his statement to an individual named Boykin.  The evidence reveals that non-party Mr. Boykin attended commission meetings and complained to Commissioner Campbell about the road's paving being finished (it was already partly paved), including bringing a petition signed by citizens regarding the road; but Commissioner Campbell testified "I don't actually remember making a promise but I told him [Boykin] at one time that I would look into it." (Doc. 23-2 at 2, 6 (Dep. Campbell at 12, 22); Doc. 31-1 at 11, 15 (Dep. Campbell at 12, 16)). "I would consider it."  (Id.) Plaintiffs failed to submit evidence of such a promise, and even if such existed, a failure to fulfill that

promise – alone -- is not evidence of intentional race discrimination. And Foshee, who prepares the annual priority list for road paving, testified that he has never seen any evidence of any road paving decisions based on race while serving as Conecuh County Engineer. (Doc. 23-4 (Decltn. Foshee)).

Finally, the Court notes that on summary judgment the Plaintiffs assert that the Commission's "governance structure" is discriminatory, resulting in an unpaved Spring Hill Road which is "the byproduct of Defendant's tolerance for the racially discriminatory paving decisions of certain of its commissioners." (Doc. 30 at 20-21). Namely, that the Commission operates under a "gentleman's agreement" through which the exclusive authority over road paving decisions in each District of Conecuh County is left to the discretion of each District's Commissioner -- with "no check of racially biased paving decisions even in the fact of repeated complaints … by residents that racial bias impacts whether certain roads are paved or not within a district." (Doc. 30 at 20-21, 24). Plaintiffs argue that this "unfettered discretion" results in "disparities in paving of roads near White homes and Black homes[;]" namely, that "when certain roads are paved are paved, District I has a history of paving stopping where the white homes end and black homes begin." (Id. at 3-4 at ¶¶5, 8). However, there is no evidence to support this conclusory allegation.

Chairman Millender testified only that there is a gentleman's agreement (no written policy), meaning each commissioner does "not get involved in other commissioner's – what they do." (Doc. 31-2 at 12, 23 (Dep. Millender at 12, 23)). Millender explained "it's up to that individual commissioner. …he has the same opportunity[]" and "I'm not going to try to tell him what road he needs to pave when he knows the people he represents. So it's strictly up to the commissioner on that particular money that we use then." (Doc. 31-2 at 20 (Dep. Millender at 20)). "We don't get involved in another guy's district. Because … he's representing a group of people in that area." (Id. at 23 (Dep. Millender at 23)).

20

In sum, apart from speculation and conjecture, Plaintiffs have submitted no evidence in support of the assertion that any such agreement is racially discriminatory.

**IV.**     **<u>Conclusion</u>**

Accordingly, it is **ORDERED** that Defendant Conecuh County Commission's Motion for Summary Judgment (Docs. 23-25) is **GRANTED.**

A Final Judgment shall issue in conjunction with this Order.

**DONE** and **ORDERED** this the **21st** day of **July 2023.**

<u>/s/ Kristi K. DuBose</u>
**KRISTI K. DuBOSE**
**UNITED STATES DISTRICT JUDGE**